IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| FLOORS UNLIMITED, INC. d/b/a FIRST FLOORS | ) ) ) | |
| VS. | ) ) | 3-93-CV-1210-AH |
| FIELDCREST CANNON, INC. | ) ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW OF THE UNITED STATES MAGISTRATE JUDGE

Pursuant to the express consents of the parties and the District Court's order of February 27, 1996, transferring the cause to the undersigned magistrate judge pursuant to 28 U.S.C. §636(c), on August 12 and 13, 1996, came on to be heard the above styled and numbered cause without a jury. Pursuant to Rule 52(a) and based upon the credible evidence, the magistrate judge makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT:

1. Plaintiff is a citizen and resident of the State of Texas.

2. Defendant is a citizen and resident of the State of North Carolina and the State of New York.

3. Beginning prior to 1972 and continuing throughout the period relevant to this action, i.e. until at least February, 1993, Defendant Fieldcrest Cannon, Inc. (Fieldcrest) manufactured carpet floor covering under the trademark brand name, Karastan. Fieldcrest in turn sold Karastan products through a network of distributors, which in turn sold Karastan carpet to retail customers. Karastan enjoyed a reputation within the carpet industry as being one of the finest carpet floor coverings manufactured in the United States.

4. Fieldcrest sold its Karastan products through a limited number of floor covering



dealers in the United States. The number of authorized dealers within a given geographic region was limited to avoid over-saturation. In addition, in order to maintain the prestige and status of the Karastan label Fieldcrest required that floor covering dealers, authorized to sell Karastan products, abide by certain policies, which included, but were not limited to, (1) proper installation and service to retail customers; (2) refraining from certain questionable advertising practices - such as "bait and switch" sales promotions; and (3) not engaging in transhipping.[1]

5. The sale of Karastan products was administered through a network of regional sales managers who had authority to establish Karastan distributors within their regions, subject to credit approvals by Defendant, and who serviced and administered existing Karastan distributors within their regions.

6. From 1972 until December 1981, Allen Robertson was the regional sales manager for a territory which included Texas. Robertson was transferred to the Washington, D.C. - Baltimore region in December 1981, at which time he was replaced as the regional sales manager for the territory which included Texas by Steve Vosburgh. In January 1983, Robertson returned to Dallas in the position of regional sales manager.

7. Beginning in 1973, Bob Dobson, Plaintiff Floors Unlimited, Inc. (Floors)'s sole stockholder and owner, approached Allen Robertson on numerous occasions in an effort to get the floor covering businesses with which Dobson was then affiliated, authorized as a dealer of Karastan products. Dobson explained that his desire to obtain a Karastan dealership was motivated in part by the fact that a floor covering business's reputation was enhanced if it were

---

[1] According to the testimony, "transhipping", sometimes referred to as "bootlegging", refers to the practice of an authorized Karastan dealer selling Karastan products to a floor covering dealer - not authorized to sell Karastan - which in turn sells the product to a retail purchaser.

a Karastan dealer and by the fact that because Karastan had a prestigious reputation in the industry, a floor covering business could place a higher mark-up on Karastan products, thus increasing a business's profitability.

8. On each occasion that Dobson sought approval from Robertson to become an authorized Karastan dealer[2] he or his company was rejected.

9. In September 1982 (See Plaintiff's Exhibit 24) Floors was approved as a dealer, authorized by Defendant to sell Karastan products.

10. The dealings between Bob Dobson and Defendant which preceded the authorization are extremely nebulous. Neither side presented unequivocal evidence as to whether Plaintiff was accepted as an authorized dealer pursuant to an oral agreement or a written contract. Defendant presented testimony and documents (e.g. Plaintiff's Exhibit 33) that a written agreement would have had to be signed before a welcoming letter (Plaintiff's Exhibit 24) could have been generated. However, in the absence of sufficient corroborating evidence and in the absence of an extant written agreement, the court finds that Plaintiff's request to become an authorized dealer and Defendant's approval of Plaintiff as an authorized dealer of Karastan products was based upon oral communications (See also Stipulated Facts No. 5).

11. Prior to September 22, 1982, in oral conversation with a representative of Defendant, Bob Dobson, on behalf of Plaintiff, knew and understood that as an authorized dealer of Karastan products Plaintiff was not obligated to purchase any specific volume of Karastan

---

[2]In both the testimony and the documentary evidence sellers of Karastan products were referred to by Defendant as customers. Regardless of the nomenclature used - either distributor or customer - these terms refer to a retail seller of floor covering which is authorized to sell Karastan products to consumers.

products and need not purchase any Karastan products at all and that Plaintiff was free to terminate its relationship with Defendant as a Karastan dealer at any time (See also Stipulated Facts No. 7).

12. The court specifically rejects Dobson's claim that Allen Robertson was the person who approved Plaintiff as an authorized dealer of Karastan products. Robertson's testimony established that he left the Dallas regional office in December 1981 and did not return until January 1983. Further, the welcoming letter (Plaintiff's Exhibit 24) "copies" Steve Vosburgh, the sales representative of Defendant in September 1982. Dobson's claim that Robertson approved Plaintiff as an authorized dealer in 1981, prior to Robertson's departure is also rejected.

13. Following his return to Dallas in January 1983, Allen Robertson called on Bob Dobson as a new Karastan dealer. On this occasion Robertson orally reviewed Defendant's policies vis-a-vis its Karastan dealers (e.g. See Plaintiff's Exhibit 22 for a partial list). At the conclusion of the meeting Robertson stated that Plaintiff could continue as a Karastan dealer as long as Plaintiff followed Defendant's rules, or words to that effect.

14. After September 1982 Plaintiff commenced purchases of Karastan products from Defendant which continued until Plaintiff was notified that it was being terminated as a Karastan dealer in February 1993 (Defendant's Exhibit 7).

15. Plaintiff never sold Defendant's goods exclusively. Plaintiff was an authorized dealer for many other manufacturers. By volume, Defendant's carpet represented approximately 5% of Plaintiff's sales each year. In addition, Plaintiff sold ceramic tile, vinyl flooring and wood flooring, all supplied by companies other than Defendant (Stipulated Facts No. 8).

16. Due to Plaintiff's slumping sales volume of Karastan products, in early 1992

Defendant initiated a sales promotion program which included providing Plaintiff with samples at no cost or at reduced costs and money for salesmen's sales contests. After these sales incentives terminated in approximately June, Plaintiff's sales of Karastan products returned to their prior levels.

17. In December 1992 Mr. Dobson wrote the president of the Karastan Division complaining of the manner in which Plaintiff's distributorship was being serviced. As a result of the letter Defendant's regional vice-president of sales and marketing (Karastan-Bigelow Division) Phil Haney, and Defendant's regional sales manager, Steve Bentley, met with Dobson on January 11, 1993.

18. In the course of the meeting Dobson reiterated a prior instance of "transhipping" by another Karastan dealer, demanded that Plaintiff be serviced by someone other than Mr. Bentley, and complained of low profitability of Karastan products because Plaintiff's salesmen were being "low balled" by other Karastan dealers' sales personnel and that he had lost confidence in Karastan's products.[3]

In response to Dobson's complaints Haney informed him that Bentley would continue to be the sales representative to which Dobson responded that it would probably be best to terminate their relationship.

19. On January 12, 1993, Mr. Haney wrote Dobson formally terminating Plaintiff's Karastan dealership, effective February 11, 1993 (Defendant's Exhibit 7).

---

[3] "Low balling" occurs when a retail customer who obtains a stated price for a product goes to another dealer and obtains the same product for a lower price. Dobson testified that since 1988 the majority of Plaintiff's carpet products have been sold under "private labels". A private label does not disclose the manufacturer, which makes it more difficult, if not impossible, for a consumer to engage in comparative shopping.

5

20. Dobson wrote Haney a reply letter (Defendant's Exhibit 20). However, Plaintiff never returned any current carpet samples for credit, nor has it provided any documentation for any other outstanding credits which it claimed were owed by Defendant.

21. To the extent that any of the following Conclusions of Law are deemed to constitute Findings of Fact, the same are incorporated by reference as if set out in full herein.

## CONCLUSIONS OF LAW:

1. To the extent that any of the foregoing Findings of Fact are deemed to constitute Conclusions of Law, the same are incorporated by reference as if set out in full herein.

2. The court has jurisdiction over the parties and the subject matter of this action.

3. Plaintiff argues that the dealership agreement entered into by the parties in September 1982 required that the agreement could not be terminated by Defendant, except for cause. Plaintiff's argument that it could be terminated only for cause is predicated on Allen Robertson's statements to Bobby Dobson sometime after January 1983 that Plaintiff could continue as a Karastan dealer as long as it followed Defendant's rules (See Finding of Fact No. 13). Assuming *arguendo* that Robertson had actual or apparent authority to enter into binding contracts on behalf of Defendant at the time of the conversation in question,[4] Plaintiff gave no consideration in exchange for the alleged amendment made by Robertson to the pre-existing oral contract, thereby rendering such alleged amendment unenforceable, i.e. at the time the contract was made

---

[4] The court notes that the legal effect of Robertson's statements is further undermined by the ambiguity of such statements, which reasonably can be construed as no more than "welcoming remarks" to a new customer, rather than an offer to amend the terms of a pre-existing contract. The ambiguity of the remarks, recalled from memory some ten years later strongly supports the policy agreement, embodied in the Statute of Frauds, requiring that such long term contracts be in writing.

in September 1982, Dobson testified that he knew and understood that Plaintiff was not obligated to make any purchases of Karastan products at all and could terminate the dealership arrangement at any time (See Finding of Fact No. 11, supra). Plaintiff did not agree to change this provision in response to Robertson's statements nor did it give any other consideration in response to Robertson's "offer".

4. Both parties were free to terminate the dealership agreement entered into in September 1982 without cause, and Plaintiff has failed to prove that Defendant breached the agreement by terminating Plaintiff's Karastan dealership, effective February 11, 1993.[5]

5. Defendant is entitled to a judgment dismissing Plaintiff's breach of contract claim with prejudice.

A copy of these findings and conclusions shall be transmitted to counsel for the parties.

ENTERED this _16th_ day of _September_____, 1996.

_____
UNITED STATES MAGISTRATE JUDGE

---

[5]The Statute of Frauds would become relevant only in determining whether a written contract was necessary to enforce a contractual requirement that Defendant could terminate the agreement only for cause. Since no such requirement existed between the parties, it is not necessary to address this defense asserted by Defendant.